## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| In Re: | ) | Case No. 5:14-bk-00769 |
| | ) | Chapter 11 |
| Terrence L. Mason & Tracey L. Mason, | ) | Document No. |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| In Re: | ) | Case No. 5:14-bk-00879 (substantively |
| | ) | consolidated with Case No.:14-bk-00769, |
| | ) | lead case) |
| | ) | Chapter 11 |
| Medical Rehabilitative Services, Ltd., | ) | |
| | ) | Document No. _____ |
| | ) | |
| Debtors. | ) | Related to Document No: 175, 426, 495 |
| | ) | **Hearing Date: October 7, 2015, 10:00 a.m.** |
| | ) | (EST) |
| | ) | **Response Deadline**: September 30, 2015 |
| _____ | ) | |

## [MODIFIED] FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY DEBTORS TERRENCE L. MASON, TRACEY L. MASON, AND MEDICAL REHABILITATIVE SERVICES, LTD., DATED OCTOBER 7, 2015, AS MODIFIED ON OCTOBER 16, 2015

TERRENCE L. MASON, TRACEY L. MASON, AND MEDICAL REHABILITATIVE SERVICES, LTD ("Debtors", "Reorganized Debtors", or "Plan Proponents"), respectfully file and propose to the creditors of the Debtors and other parties in interest the following FOURTH AMENDED Chapter 11 plan of reorganization, dated October 16, 2015, (as may be further amended, the "Plan" or "Modified Plan"), which is proposed pursuant to the provisions of Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended (the "Code" or "Bankruptcy Code").

## AMENDMENTS:

On August 10, 2015, the Honorable Judge Jeffrey Deller, United States Bankruptcy Judge for the United States Bankruptcy Court for the Western District of Pennsylvania, facilitated a successful mediation at which certain parties devised a global resolution of the issues underlying the Debtors' Lien Determination Adversary Proceeding, the Debtors' objections to the Claims of the IRS and the WVSTD, as well as the Debtors' treatment of the claims of most taxing bodies in

the Plan.  This  [Modified] Fourth Amended Plan has been amended primarily to reflect those global resolutions and any updates on open matters, as well as to incorporate language resolving issues raised at the October 7, 2015 Confirmation Hearing.  The proposed Modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the Modifications (defined and described herein) pursuant to Federal Bankruptcy Rule 3019(a).

## ARTICLE I
## DEFINITIONS AND RULES OF CONSTRUCTION

1.    For purposes of this Plan, and unless the context otherwise requires, the terms set forth below shall have the following meanings:

**1.1.    1 Community Street Property** or the **Facility** or **Mason Rehab Center** means the commercial property located at 1 Community Street, Wheeling, West Virginia, including all buildings and improvements.  It serves as collateral for the Enterprise Loan 1 and 2. The Mason Rehab Center, Trans Medical Rehab Center and Camelot are or were all operating out of this property. Debtor Terry Mason owns this property in his name only.

**1.2.    113 Bello Vedere Property** or the **Bello Vedere Property** means the residential property located at 113 Bello Vedere, Wheeling, West Virginia, including all improvements thereto.  This property is the current primary residence of Debtors Terry and Tracey Mason.  Debtor Tracey Mason owns this property in her name only.

**1.3.    Acquired Capital Claim** shall mean that certain deficiency claim of Acquired Capital, LP against the Debtors.   On its Scheduled, the Debtors listed Acquired Capital, LP as having a disputed unsecured claim in the amount of $225,425.  On June 4, 2015, this claim was transferred by Acquired Capital to Radiance Capital Receivables Fifteen, LLC (CM/ECF#385).  This Claim herein shall still be referred to as the Acquired Capital Claim.

**1.4.    Actions** means any and all claims, causes of action or choses in action of the Estate which are not released hereunder, whether legal, equitable or otherwise, against any other party, whether arising before or after the Petition Date, including, but not limited to, Avoidance Actions and all other claims, causes of action, choses in action, counterclaims, and cross-claims, whether arising under state or federal law.

**1.5.    Administrative Bar Date** means the date for the filing of (i) all pre-Confirmation Date Administrative Claim applications which is the thirty (30) days following the Confirmation Order becoming a Final Order and (ii) all post-Confirmation Date, pre-Effective Date Administrative Claim applications which is 60 days after the Effective Date.

**1.6.    Administrative Claim** means, except as otherwise specified in the Plan, a Claim for payment of an administrative expense of a kind specified in Code § 503(b) and referred to in Code § 507(a), including, without limitation, compensation for legal and other professional services rendered to or on behalf of the Estate, reimbursement of expenses awarded under Code

§§ 330(a) or 331, other post-Petition Date accounts payable arising in the ordinary course of business which are accrued as of the Effective Date in accordance with generally accepted accounting principles, consistently applied, and all fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930, including, without limitation, the United States Trustee Fees and the fees to the Clerk of Court.

      **1.7.**    **Allowed Claim** means a Claim against the Debtors, to the extent that a proof of claim (i) was filed with the Court and no objection to the Claim is filed within the time fixed either by the Court or this Plan for such objections, or (ii) is deemed filed pursuant to Code § 1111(a) and no objection to the Claim is filed within the time fixed either by the Court or this Plan for such objections, (iii) is, or is deemed to be, an Allowed Claim pursuant to a Final Order or this Plan, or (iv) a claim is listed in the Schedules as other than "contingent, unliquidated or disputed". A Claim that appears on the Schedules as "disputed", "contingent", or "unliquidated" and for which a proof of claim has not been filed is deemed to be a disallowed Claim.

      **1.8.**    **Allowed IRS Priority Tax Claim** means all or that portion of any Priority Tax Claim that is or has become an Allowed Claim asserted by the IRS, excluding any Tax Penalty Claim asserted by the Internal Revenue Service.

      **1.9.**    **Allowed Ohio State Priority Tax Claim** means all or that portion of any Priority Tax Claim that is or has become an Allowed Claim asserted by the Ohio Department of Taxation, excluding any Tax Penalty Claim asserted by the Ohio Department of Taxation.

      **1.10.**    **Allowed Ohio County Priority Tax Claim** means all or that portion of any Priority Tax Claim that is or has become an Allowed Claim asserted by the Ohio County Sheriff's Tax Office, excluding any Tax Penalty Claim asserted by the Ohio County Sheriff's Tax Office. The Court has entered an Order disallowing the claims filed by Ohio County (CM/ECF #288, entered on April 1, 2015). The WV Auditor on behalf of the Ohio County Sheriff filed a motion for reconsideration of this Order (CM/ECF#380, filed on June 1, 2015), which is still was granted. This matter remains unresolved.

      **1.11.**    **Allowed Priority Claim** means all or that portion of any Priority Claim that is or has become an Allowed Claim, other than an Allowed Priority Tax Claim or Allowed Tax Penalty Claim.

      **1.12.**    **Allowed Priority Tax Claim** means all or that portion of any Priority Tax Claim that is or has become an Allowed Claim, excluding any Tax Penalty Claim asserted by any taxing authority, including but not limited to the Ohio Department of Taxation, City of Wheeling, West Virginia State Tax Department, Ohio County Sheriff's Tax Office, or the Internal Revenue Service.

      **1.13.**    **Allowed Professional Fees** means all or the portion of an Administrative Claim for Professional Fees that is allowed by the Court for payment by the Debtors or Reorganized Debtors.

1.14. **Allowed Unsecured Claim** means all or that portion of any Unsecured Claim that is or has become an Allowed Claim, including any Tax Claim that is not a Priority Tax Claim.

1.15. **Allowed WVSTD Priority Tax Claim** means all or that portion of any Priority Tax Claim that is or has become an Allowed Claim asserted by the West Virginia State Tax Department, excluding any Tax Penalty Claim asserted by the West Virginia State Tax Department.

1.16. **Assets** means all property, owned by the Debtors on the Petition Date, of any nature whatsoever, real or personal, tangible or intangible, including but not limited to the Personal Property, and the Actions, but excluding any and all property which is either not property of the Estate under Code § 541.

1.17. **August 10th Mediation** means that successful mediation conducted on August 10, 2015, by the Honorable Judge Jeffrey Deller, United States Bankruptcy Judge for the United States Bankruptcy Court for the Western District of Pennsylvania, at which parties devised a global resolution of the issues underlying the Lien Determination Adversary Proceeding, the Debtors' objections to the Claims of the IRS and the WVSTD, as well as the Debtors' treatment of the claims of most taxing bodies in the Plan.  This Plan has been amended to reflect those global resolutions.

1.18. **Avoidance Action** means any claim or cause of action of the Debtors or its Estate that is or may be the subject of an adversary proceeding under §§ 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code or other applicable law that have not been deemed settled or released by the Plan.

1.19. **Bar Date** means **December 3, 2014**, for non-governmental claims and **February 3, 2014** for governmental claims.

1.20. **Bankruptcy Rules** mean the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules of the Court, as applicable and in force at the commencement of these Debtors' Cases and amended from time to time.

1.21. **Belmont Savings Bank Car Loan** means that secured loan made pursuant to that certain loan agreement executed by Belmont Savings Bank and Tracey Mason (as borrower) on or about June, 2011, and delivered to Belmont Savings Bank, in which Belmont Savings Bank agreed to lend for the purpose of Ms. Mason's purchase of a 2012 Ford Escape.  Upon information and belief, the term of the Belmont Savings Bank Car Loan was for a period of five (5) years with interest accruing on an annual basis at a fixed per annum rate. The Debtors make monthly payments in the amount of approximately $415.55 on the Belmont Savings Bank Car Loan.   The Belmont Savings Bank Car Loan is secured by a collateral interest in the 2012 Ford Escape.

The Debtors scheduled Belmont Savings Bank as holding a secured claim against the Debtors' Estate in the amount of $13,716 for the Belmont Savings Bank Home Loan. Belmont Savings Bank has not filed a Proof of Claim.   On the Schedules, the Debtors placed a value on 2012 Ford Escape in the amount of $14,000.

**1.22.    Belmont Savings Bank Car Loan Documents** means that certain loan agreement and any related documents executed by Tracey Mason and Belmont Savings Bank in conjunction with the Belmont Savings Bank Car Loan.

**1.23.    Belmont Savings Bank Home Loan** means that secured loan made pursuant to that certain loan agreement executed by Belmont Savings Bank and Tracey Mason (as borrower) on or about June 3, 2013, and delivered to Belmont Savings Bank, in which Belmont Savings Bank agreed to lend the sum of $452,000, for the purpose of Ms. Mason's purchase of the Debtors' home at 113 Bello Vedere Property.   Upon information and belief, the term of the Belmont Savings Bank Home Loan was for a period of thirty (30) years with interest accruing on an annual basis the fixed per annum rate of 4.375%.   The Debtors make monthly payments in the amount of approximately $2,779.34 on the Belmont Savings Bank Home Loan.

The Belmont Savings Bank Home Loan is secured by a Deed of Trust on the 113 Bello Vedere Property, as evidenced by a Mortgage.    Belmont Savings Bank's lien position on the Bello Vedere Property has been disputed and was the subject matter of the Lien Determination Adversary Proceeding.

The Debtors scheduled Belmont Savings Bank as holding a secured claim against the Debtors' Estate in the amount of $448,919.33 for the Belmont Savings Bank Home Loan. Belmont Savings Bank has not yet filed a Proof of Claim.   On the Schedules, the Debtors placed a value on 113 Bello Vedere Property in the amount of $565,000.   Upon information and belief, the current fair market value of the 113 Bello Vedere Property is expected to be $580,000.

**1.24.    Belmont Savings Bank Home Loan Documents** means that certain loan agreement, Mortgage and related documents executed by Tracey Mason and Belmont Savings Bank in conjunction with the Belmont Savings Bank Home Loan.

**1.25.    Business Day** means any day, except Saturday, Sunday, Memorial Day or any other day on which national commercial banks in the State of West Virginia are closed.

**1.26.    Camelot** means Camelot, LLC, the entity formed by Terry Mason and Tracey Mason to operate a restaurant out of the 1 Community Street Property.   Terry Mason owns a 90% interest in Camelot and Tracey Mason owns a 10% interest in Camelot.   The restaurant fell into disrepair after the Masons permitted a new manager to maintain operations.   Camelot's operations ceased on or about the end of January, 2015, after pipe burst, doing substantial damage to the restaurant.   The Debtors have been in negotiations with various parties to lease the restaurant space.   In January of 2015, the Debtors negotiated with Rio Concho Restaurant Group for the lease of the space; Rio Concho defaulted on its lease obligations which resulted in the initiation of the Rio Concho Adversary Proceeding.    The Debtors continue to talk to interested parties

regarding the lease of the space.

      **1.27.**   **Camelot Assets** means all personal property of Camelot, LLC as well as all types of collateral including any restaurant equipment, inventory, chattel paper, accounts, general intangibles, fixtures, standing timber, deposit accounts, and investment property.  In addition to the Medical Rehab Assets, the Camelot Assets serve as collateral for the Enterprise Bank Loans 1 and 2.   The IRS and the WVSTD may also have a lien on certain Camelot Assets.

      **1.28.**   **Case(s)** means the within bankruptcy cases commenced by the Debtors by virtue of the filing of a petition for relief under Chapter 11 of the Code on the Petition Date.

      **1.29.**   **Cash or Cash Payment** means all cash and cash equivalents, including, but not limited to, bank deposits, checks and other similar items in whatever form, wherever located, and by whomsoever held.

      **1.30.**   **Claim** means, as against the Estate, whether incurred prior to or after the Petition Date: (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured or as otherwise defined in Code § 101(5).

      **1.31.**   **Class** means each class of Claims or Interest established pursuant to Article II of this Plan.

      **1.32.**   **Code or Bankruptcy Code** means title 11 of the United States Code, 11 U.S.C. §§ 101-1330 as may be amended from time to time.

      **1.33.**   **Collateral** means any property or interest in property of the Estate or the Debtors subject to a Lien to secure a Claim to the extent such Lien is not subject to avoidance under the Bankruptcy Code or such avoidance has been settled by this Plan, nor otherwise invalid under the Bankruptcy Code or applicable state law.

      **1.34.**   **Confirmation Date** means the date on which the Clerk of the Court enters the Confirmation Order on the docket in the Case.

      **1.35.**   **Confirmation Hearing Date** means the date set by the Court for the commencement of the Confirmation Hearing.

      **1.36.**   **Confirmation Order** means the order of the Court confirming the Plan, as modified herein, pursuant to Code § 1129.

      **1.37.**   **Court** means the United States Bankruptcy Court for the Northern District of West Virginia or such other court having jurisdiction over the Case.

**1.38.   Debtors** means Terrence L. Mason, Tracey L. Mason, and Medical Rehabilitative Services, Ltd.

**1.39.   Disbursing Agent** means the Reorganized Debtors who shall effectuate this Plan and hold and distribute consideration to be distributed to holders of Allowed Claims pursuant to the provisions of the Plan and Confirmation Order.

**1.40.   Disclosure Statement** means that certain Fourth Amended Disclosure Statement, dated
October 7, 2015, as may be amended, filed together with the Fourth Amended Plan, dated October 7, 2015.

**1.41.   Disputed Claim** means any Claim, or portion thereof, for which no Final Order has Allowed or disallowed such Claim or portion thereof and as to which (i) a proof of claim has been filed in an unliquidated amount; (ii) an objection, or request for estimation, has been filed (and not withdrawn) by any party in interest; or (iii) an Adversary Proceeding has been commenced to determine the extent priority or validity of the Claim or to subordinate the Claim or (iv) an Avoidance Action has been commenced and the avoided amount has not been paid to the Debtors. In the event that any part of a Claim is disputed, such Claim in its entirety shall be deemed to constitute a Disputed Claim for purposes of distribution under this Plan unless the Plan Proponent and the Holder thereof agree otherwise.   Without limiting any of the above, a Claim that is the subject of a pending application, motion, complaint or any other legal proceeding seeking to disallow, subordinate or estimate such Claim shall be deemed to constitute a Disputed Claim.

**1.42.   Effective Date** means the first Business Day following twenty-five (25) days following the date that the Confirmation Order becomes a Final Order.   However, at the option of the Debtors, a Confirmation Order subject to a pending appeal or certiorari proceeding may be considered a Final Order provided no order has been entered by any court of competent jurisdiction staying the effect of the Confirmation Order.   At this time, the Debtors estimate this date to be December 1, 2015.

**1.43.   Enterprise Loan 1** means that secured loan made pursuant to a certain Construction Loan Agreement executed by Medical Rehab, Camelot, LL, and Terrence and Tracey Mason (as co-borrowers) on September 1, 2006, and delivered to Enterprise Bank, in which Enterprise Bank agreed to lend the sum of $2,000,000.00 for the purposes of funding relating to construction of Camelot, a restaurant operating in Wheeling, West Virginia out of the 1 Community Street Property, as evidenced by the terms of a certain U.S. Small Business Administration Note and a certain Construction Loan Agreement (the "SBA Construction Loan"). The term of the Enterprise Loan 1 initially was for a period of twenty (20) years and six months with interest accruing on annual basis at the variable rate of prime plus 1% (although the rate was fixed at 8.25% for the first five (5) years of Enterprise Loan 1).   Subsequently, the parties entered into several subsequent Change in Terms Agreements, ultimately changing the maturity date and interest rates on Enterprise Loan 1.

The Debtors had been making monthly payments in the amount of approximately $12,800.00 for Enterprise Loan 1.  The Enterprise Loan 1 is secured by a first Deed of Trust on the 1 Community Street Property, as well as 1287 National Road, Wheeling WV 26003 (the latter of which has been subsequently sold), as well as a Deed of Trust on the 113 Bello Vedere Property. Enterprise Loan 1 is further secured by a recorded Enterprise Assignment of Rents to all of Terry Mason's right, title and interest in and to the leases and rents from both properties.

Enterprise Loan 1 is also secured by a first lien in all of the Medical Rehab Assets and Camelot Assets pursuant to certain Commercial Security Agreements ("Enterprise SBA Security Agreements") including but not limited to Inventory, Chattel Paper, Accounts, Equipment and General Intangibles which security interests were perfected by filing UCC-1 Financing Statement and Continuances thereof with the West Virginia Department of State ("Enterprise SBA Loan UCC's").  Enterprise Bank also holds assignments of certain life insurance policies on Terry Mason.

On or about December 12, 2011, Borrowers executed and delivered in favor of Enterprise Bank a certain Forbearance and Modification Agreement ("Forbearance Agreement") pursuant to which Borrowers repaid certain real estate tax advances made by Enterprise Bank for the 1 Community Street Property and 1287 National Road Property.

The Debtors scheduled Enterprise Bank as holding a secured claim against the Debtors' Estate in the amount of $1,491,316.12 for Enterprise Loan 1 and $492,882.51 for Enterprise Loan 2.  Enterprise Bank filed proofs of claim in each of the Debtors' Cases (Assigned Claim No. 10 in the Medical Rehab Case and assigned Claim No. 23 in the Masons Case) asserting a pre-petition claim in the amount of $1,946,377.40, and marking the secured portion as "Unknown".   Unpaid default interest and collection expenses are unknown at this time.

On the Schedules, the Debtors placed a value on the 1 Community Street Property in the amount of $2,200,000.

**1.44.   Enterprise Loan 1 Documents** means the documents evidencing the Enterprise Loan 1, including a Construction Loan Agreement, U.S. Small Business Administration Note, the Enterprise Assignment of Rents, Enterprise SBA Security Agreements, and Enterprise SBA Loan UCC's.

**1.45.   Enterprise Loan 2** means that secured term loan made pursuant to a certain Business Loan Agreement executed by Medical Rehab, Camelot, LLC, and Terrence and Tracey Mason (as co-borrowers) on June 30, 2008, and delivered to Enterprise Bank, in which Enterprise Bank agreed to lend the original principal sum of $1,950,000 for the purposes of operations, as evidenced by the terms of a certain Promissory Note.  The term of the Enterprise Loan 2 was for a period of ten (10) + years with interest accruing on annual basis at the fixed per annum rate of 7.25%., maturing on April 5, 2019 .   Several subsequent change in terms agreements were executed. The Debtors had been making monthly payments in the amount of approximately $8,900.00 on Enterprise Loan 2.

The Enterprise Loan 2 is secured by a (2nd position) Deed of Trust on the 1 Community Street Property, as well as 1287 National Road, Wheeling WV 26003 (the latter of which has been subsequently sold), as well as a Deed of Trust on the 113 Bello Vedere Property. Enterprise Loan 2 was further secured by an Enterprise Assignment of Rents to all of Terry Mason's right, title and interest in and to the leases and rents from both properties.

Enterprise Loan 2 is also secured by a second lien on all of the Medical Rehab Assets and Camelot Assets pursuant to certain Commercial Security Agreements ("Enterprise Business Loan Security Agreements") including but not limited to Inventory, Chattel Paper, Accounts, Equipment and General Intangibles which security interests were perfected by filing UCC-1 Financing Statement and Continuances thereof with the West Virginia Department of State ("Enterprise Business Loan UCC's").

On or about December 12, 2011, Borrowers executed and delivered in favor of Enterprise Bank a certain Forbearance and Modification Agreement ("Forbearance Agreement") pursuant to which Borrowers repaid certain real estate tax advances made by Enterprise Bank for 1 Community Street Property and 1287 National Road Property.

**1.46.   Enterprise Loan 2 Documents** means the documents evidencing the Enterprise Loan 1, including a Construction Loan Agreement, Promissory Note, the Enterprise Assignment of Rents, Enterprise Business Loan Security Agreements, and Enterprise Business Loan UCC's.

**1.47.   Enterprise Loan Documents** means collectively, the Enterprise Loan 1 Documents and the Enterprise 2 Loan Documents.

**1.48.   Estate** means the estate of the Debtors within the meaning of Code § 541.

**1.49.   Facility** means 1 Community Street Property, out of which Mason Rehab Center, Trans Medical, and/or Camelot are or once were operating.

**1.50.   Final Order** means an order or judgment (i) as to which the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending; or (ii) as to which any right to appeal, move for a stay pending appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Plan Proponent or, (iii) in the event that an appeal, writ of certiorari or reargument or rehearing thereof has been sought, such order shall have been denied by the highest court to which such order was appealed, or certiorari reargument or rehearing shall have been taken and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rules 9023 or 9024 may be filed with respect to such order shall not cause such order not to be a Final Order.

**1.51.   Holder** means the beneficial owner or holder of any Claim or Interest also sometimes referred to as a "Claim Holder" or "Interest Holder".

1.52.   **IRS** means Internal Revenue Service.

1.53.   **Lien** means a "lien" as defined in Code § 101(37).

1.54.   **Lien Determination Adversary Proceeding** means that certain adversary proceeding filed on April 17, 2015, in these Chapter 11 Cases by the Debtors, as plaintiffs, against Belmont Savings Bank, Enterprise Bank, the IRS, WVSTD, and Ohio County Sheriff's Office, as Defendants.   The Debtors  initiated this Adversary Proceeding by filing the (I) Adversary Complaint to Determine the Validity, Priority, and Extent of the Liens of Defendants Pursuant to 11 U.S.C. 506 and Fed. R. Bankr. P. 3012 and 7001(2) and (II) Objection of Plaintiffs to Claims of Belmont Savings Bank Pursuant to 11 U.S.C. Section 105(A), 502(b), 505(a) and Fed. R. Bankr. P. 3007; and (III) Request for Declaratory Judgment (Adv. Case. No. 5:14-bk-00769).   As set forth in the Complaint, Belmont Saving Bank, Enterprise Bank, the IRS, the Ohio County Sheriff's Office, and the WVSTD, each assert competing lien positions in the Debtors' personal residence, the Bello Vedere Property.

At the same time, the Defendants also assert competing lien positions on the Rehab Center, MRS Assets, Camelot Assets, the 2012 Ford Escape, and/or the Masons' personal assets.   The Debtors initiated that the Lien Determination Adversary Proceeding in order to resolve these controversies.   The Debtors seek a Court declaration regarding the actual rights and obligations of the parties and a determination as to the validity, nature and extent of the Defendants' interests in such assets.   As a result of the August 10th Mediation, the parties to the Lien Determination Adversary Proceeding jointly intend to dismiss the proceeding without prejudice.

1.55.   **Mason Rehab Center** also means 1 Community Street Property or the Facility or Rehab Center.   The Ohio County Sheriff's Office, Enterprise Bank, the IRS, and the WVSTD also have liens on the Mason Rehab Center.   For plan purposes, the Debtors assumed a value of $2,200,000 for the Rehab Center.

1.56.   **Medical Rehab Assets** means all real or personal property of the Debtor Medical Rehab as well as all types of collateral including equipment, inventory, chattel paper, accounts, general intangibles, fixtures, standing timber, deposit accounts, investment property. . In addition to the Camelot Assets, the Medical Rehab Assets serve as collateral for the Enterprise Bank Loans 1 and 2.   The IRS and the WVSTD may also have liens on certain Medical Rehab Assets.   For plan purposes, the Debtors have assumed a value of approximately $250,000 for the Debtors' personal assets and the MRS Assets.

1.57.   **Medical Rehabilitative Services, Ltd.** shall also mean Medical Rehab or Medical Rehab Services or Mason Rehab or Mason Rehab Center.   Medical Rehab was formed by Terry Mason as a 100% shareholder for the operation of a physical therapy facility.

1.58.   **Medical Rehab Shareholder Claim** shall mean that certain unsecured loan made to Terry Mason, as debtor, by Medical Rehab, as creditor, in the amount of $684,590.00. Because Medical Rehab is an affiliate of Terry Mason, this claim shall be separately classified.

1.59.   **Ohio Valley Medical Center** or **OVMC** shall mean that certain hospital which is a West Virginia non-profit corporation part of the Ohio Valley Health Services and Education Corporation.  OVMC operates a Department of Physical Therapy that provides physical therapy services and facilities. During the course of operating Medical Rehab Services, Terry Mason pre-petition leased out a significant portion of Facility to OVMC; such lease terminated in early 2014.  OVMC desired to continue to operate an outpatient location at the Facility and it was in need of physical therapists with the appropriate level of training and experience to service its patients, on an independent contractor basis; Trans Medical has agreed to provide such therapists (including Terry Mason) to OVMC, pursuant to terms of that certain *OVMC-Trans Medical Services Agreement.*  OVMC, at same time, agrees again to lease a significant portion of the Facility from Mr. Mason, individually for the purposes of operating of its Outpatient Department, pursuant to the terms of a certain *OVMC-Terry Mason Lease Agreement.*  On December 10, 2014, the Debtors sought authority from this Court to, *inter alia*, enter into such agreements.

At the same time that the Debtors sought approval of these agreements, the Debtors sought approval of the *Trans Medical Services-Terry Mason Lease Agreement*, whereby Trans Medical agrees to lease a portion of the Facility from Mr. Mason.   An order was entered approving the *Trans Medical Services-Terry Mason Lease Agreement* and the *OVMC-Terry Mason Lease Agreement* on April 2, 2015 (CM/ECF#290).  Approval of the *OVMC-Trans Medical Services Agreement* was not necessary since Trans Medical is a non-debtor.

Mr. Mason receives rental income from OVMC in the amount of $10,052.15 on a monthly basis.  TMS also receives income in the amount of approximately $4,800 a month pursuant to the *OMVC-Trans Medical Services Agreement.*   Mr. Mason receives rental income from Trans Medical in the amount of $14,043.00 on a monthly basis.

1.60.   **Person** shall have the same meaning as provided in Code § 101(41).

1.61.   **Personal Property** means all of the Debtors' personal property as scheduled on Schedule B of the Debtors' official schedules as amended.

1.62.   **Petition Date** means July 8, 2014.[1]

1.63.   **Plan Proponent** means Terrence L. Mason, Tracey L. Mason, and Medical Rehabilitative Services, Ltd.

1.64.   **Plan Supplement** means any additional documents filed with the Court by the Plan Proponent on or before the commencement of the Confirmation Hearing supplementing any provisions of the Plan as provided for in the Plan.

---

[1]      Although the Medical Rehab case was filed separately on August 8, 2014, the "Petition Date" for both of these consolidated cases of the Debtors shall be deemed July 8, 2014, in accordance with this Court's Order Granting Motion to Consolidate Lead Case 5:14-bk-0769 with 5:14-bk-879 (Related Doc # 64) and Denying as Moot Motion for Joint Administration (CM/ECF#98, filed on September 9, 2014).

1.65.    **Priority Claim** means any Claim which may be validly asserted pursuant to Code § 507(a) other than an Administrative Claim, Priority Tax Claim, or Tax Penalty Claim.

1.66.    **Priority Tax Claim** means any Claim which may be validly asserted by federal, state or local governmental tax authorities pursuant to Code § 507(a)(8).

1.67.    **Professional Fees** means Claims by professional persons employed pursuant to Code §§ 327 and 1103 for compensation and reimbursement of expenses pursuant to Code §§ 330 and 331 or other provisions of the Code or fees and costs of the Reorganized Debtors incurred post-Effective Date.

1.68.    **Quarterly Fees** means the sums that the Debtors or Reorganized Debtors are required to pay to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6).

1.69.    **Rejection Claim** means any Claim, proof of which is timely filed, arising under Code § 502(g) as a result of the rejection of an executory contract or unexpired lease.

1.70.    **Rejection Claims Bar Date** means the date by when any party to a rejected executory contract and/or unexpired lease must file a Rejection Claim within thirty (30) days of the Confirmation Date.

1.71.    **Reorganized Debtors** means the Debtors once the Effective Date occurs under this Plan.

1.72.    **Rio Concho Adversary Proceeding** means that certain adversary proceeding filed on May 6, 2015, in these Chapter 11 Cases by the Debtors, as plaintiffs, against Concho Investment Properties, LLC, Rio Concho Catering, Rio Restaurant Group, Inc., and John Young, (Adv. Case No. 5:15-ap-00020).  The Debtors initiated this Adversary Proceeding relating to certain Defendants' occupancy of the Camelot space.  The Debtors alleged, *inter alia,* breach of Defendants' lease obligations.

1.73.    **Schedules** mean the Debtors' schedules of assets and liabilities and statement of financial affairs, as amended from time to time, filed by the Debtors with the Court pursuant to Bankruptcy Rule 1007.

1.74.    **Secured Claim** means the portion of any Claim determined in accordance with §§ 506(a) and 1111(b) of the Bankruptcy Code, as of the Confirmation Date, that is (a) secured by a valid, perfected and unavoidable Lien, to the extent of the value of the Holder's interest in the Debtors' interest in the Collateral (b) subject to offset under § 553 of the Bankruptcy Code, to the extent of the amount subject to offset.

1.75.    **Tax Penalty Claim** means any Claim arising from or based upon interest, penalties, or additions attributable to or imposed on or with respect to one or more assessments of Taxes.

**1.76.    Taxes** means all taxes, charges, fees, levies, or other assessments by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, use and occupancy, business privilege, net profits, occupation, intangible and withholding taxes, license, severance, and franchise taxes, excluding any interest, penalties or additions attributable to or imposed by the West Virginia State Tax Department, City of Wheeling, Ohio County Tax Office, Ohio Department of Taxation, or the Internal Revenue Service on or with respect to such taxes, charges, fees, levies or other assessments.  This definition shall not preclude the Debtors or the Plan Proponent from any right to object to any other or further Claim either timely or tardily filed by any claimant for any Taxes which includes a claim for interest or penalties or additions attributable thereto.

**1.77.    Terry Mason** shall mean Debtor Terrence Mason.

**1.78.    Third Amended Plan** shall mean that Plan of Reorganization filed in the Debtors' Cases on August 26, 2015, together with the Third Amended Disclosure Statement

**1.79.    Trans Medical Assets** means all real or personal property of Trans Medical as well as all collateral types including equipment, inventory, chattel paper, accounts, general intangibles, fixtures, standing timber, deposit accounts, investment property, and mineral, oil, and gas as well as all right, title, and interest in and to all present and future leases of and rents from the 1 Community Street Property.

**1.80.    Trans Medical Services, LLC** shall also mean Trans Medical or TMS. Tracey Mason is a 90% shareholder, while Christopher Ross is 10% shareholder.  Trans Medical was formed in 2014.   Trans Medical renders physical therapy services out of the 1 Community Center Property a/k/a Trans Medical Rehab Center.   Since January 2014, as Medical Rehab's operations have become *de minimis*, Trans Medical's operations are now in full swing.

Terry Mason, individually, services patients through Trans Medical as an employee.  Tracey Mason is also employed by TMS.  Each take a salary from TMS (gross about $3,750/month each gross).

As stated above, TMS receives income in the amount of approximately $4,800 a month pursuant to the *OMVC-Trans Medical Services Agreement.*   Independently, TMS anticipates monthly revenue of $62,400 with 480 patient visits a month.  In addition to the $14,034 monthly OVMC rent, Mr. Mason also receives rental income from TMS in the amount of $10,502 on a monthly basis.  All four (4) of these streams of revenue will be used to fund this Plan.

**1.81.  United States Trustee Fees** means the Quarterly Fees.

**1.82.  Unclaimed Property** means any distributions to creditors that are unclaimed, including, without limitation, (i) Cash and checks (and the funds represented thereby) that have been mailed to creditors and returned as undeliverable without a forwarding address; and (ii) checks (and the funds, represented thereby) that were not mailed or delivered because of the absence of a proper address to which to mail or deliver such property.

**1.83.    Unsecured Claim** means any Claim, whether or not disputed, liquidated or contingent, which is not an Administrative Claim, a Priority Claim, a Priority Tax Claim, § 1111(b) Unsecured Claims, or a Secured Claim.

**1.84.    Voting Deadline** means the date set by the Court as the last date for receipt of ballots for acceptance or rejection of the Plan.

**1.85.    WSJ Prime** means Prime Rate for lending as published on a daily basis in the Wall Street Journal.

**1.86.    Rules for Interpreting Undefined Terms**.  All terms used in this Plan and not defined herein but that are defined in the Code shall have the respective meanings assigned to such terms in the Code.  All terms used in this Plan and not defined herein or in the Code but that are defined in the Bankruptcy Rules shall have the respective meanings assigned to such terms in those rules.

**1.87.    Rules of Construction.**  The words "herein," "hereof" and "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan unless the context requires otherwise.  Whenever from the context it appears appropriate, each term stated in either the singular or the plural includes the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender include the masculine, feminine and the neuter.

<u>**ARTICLE II**</u>
<u>**CLASSIFICATION OF CLAIMS AND INTERESTS**</u>

The Holders of Claims and Interest are classified under the Plan, as follows:

2.    <u>**Unclassified Claims**</u>.  Administrative Claims and Priority Tax Claims shall be treated in accordance with the Plan, but are not required to be classified pursuant to Code § 1123(a)(1).

2.1.    <u>**Class 1**</u> shall consist of the Enterprise Bank Claim.

2.2.    <u>**Class 2**</u> shall consist of the Belmont Savings Bank Home Loan Claim.

2.3    <u>**Class 3**</u> shall consist of the Belmont Savings Bank Car Loan Claim.

2.4.    <u>**Class 4**</u> shall consist of the Priority Claims-Non-Tax Claims.

2.5    <u>**Class 5**</u> shall consist of the General Unsecured Creditors.

2.6.    <u>**Class 6**</u> shall consist of the Interest Holders of Medical Rehab Services.

2.7.   **Class 7** shall consist of the Medical Rehab Shareholder Loan Claim.

2.8.   **[INTENTIONALLY OMITTED.  ACQUIRED CAPITAL CLAIM NOW IS TREATED IN CLASS 5 GENERAL UNSECURED CREDITORS].**


**ARTICLE III**
**IDENTIFICATION OF CLASSES OF CLAIMS THAT**
**ARE AND ARE NOT IMPAIRED UNDER THE PLAN**

3.   **Classes Of Claims Not Impaired or Deemed to  Reject**.  Claims and Interests in Classes 2, 3, 4, and 6 are not impaired under the Plan. Solicitation of acceptance with respect to Classes 2, 3, 4, and 6 are not required under Code § 1126(f).

3.1.   **Impaired Classes Of Claims And Interests**.  Claims in Classes 1, and 5are impaired and are entitled to vote on the Plan.  While Class 7 is impaired, it is s receiving no distribution pursuant to the Plan.  To the extent the acceptance of Class 7 is required, it is deemed to have accepted the Plan.

3.2.   **Impaired Classes To Vote**.  Only those Classes holding impaired Claims shall be entitled to vote as a Class to accept or reject the Plan.  In the event of a cram-down pursuant to 11 U.S.C. § 1129, the holder of the Class 7 Claim shall not be counted for that purpose because Medical Rehab is  "insider" of the Debtors Terrence L. Mason and Terry L. Mason within the meaning of 11 U.S.C. §101(31)(B)(vi).

3.3.   **Acceptance By Class Of Creditors**.  A Class of Claims shall have accepted the Plan if the Plan is accepted by Holders in such Class that hold at least two-thirds of the aggregate dollar amount and more than one-half in the number of the Allowed Claims of creditors of such class that vote to accept or reject the Plan. Creditors holding Claims in more than one Class may vote in each class by casting separate ballots in each such Class (unless the Class has elected treatment of their Allowed Unsecured Claim as a Secured Claim under § 1111(b)(2) of the Code).

3.4.   **One Vote Per Holder**.  If a Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number and amount of Claims in such Class voting on this Plan.


**ARTICLE IV**
**TREATMENT OF CLAIMS AND INTERESTS**

The  treatment  of and  consideration  to  be  received  by  Holders  of  Allowed  Claims  and Interests pursuant to this Article IV shall be in full satisfaction, settlement and release of such Holder's respective Claims against the Estate.  The rights of Holders with respect to their Claims and  Interests  following  the  Confirmation  Date  shall  arise  exclusively  under  the  Plan  and Confirmation Order and any documents or instruments entered into in connection therewith.

4.1    **Unclassified Claims**.

      4.1.1.    **Allowed Administrative Claims**.  Each Holder of a pre-Confirmation Date, pre- Effective Date Allowed Administrative Claim, including Debtors' counsel and the accountants for the Debtors, on the Effective Date of this Plan, shall be paid his or her unpaid Allowed Administrative Claims in Cash in full on Effective Date or as the Holder otherwise agrees to different treatment.  All post-Confirmation, pre-Effective Date Administrative Claims shall be paid in full by the Reorganized Debtor in Cash within sixty (60) days after such Claim becomes an Allowed Administrative Claim, unless the Holder of such Allowed Administrative Claim agrees to be treated differently.  Debtors are not aware of any other Allowed Administrative Claims. However, any such other Claims that may exist shall be paid in full on Effective Date or as the Holder otherwise agrees to different treatment.  In the event that any Administrative Claim is a Disputed Claim on the Effective Date, such Claim, or any portion thereof, shall be paid within sixty (60) days after such Claim becomes an Allowed Administrative Claim, unless the Holder of such Allowed Administrative Claim agrees to be treated differently.  Such disputed amounts (or amounts pending allowance by the Court) shall be reserved by the Reorganized Debtors until the dispute is resolved.

      The Confirmation of the Plan will impose the Administrative Bar Date (defined herein) requiring the filing of (i) all pre-Confirmation Date Administrative Claim applications and (ii) all post-Confirmation Date, pre-Effective Date Administrative Claim applications.

      The estimated aggregate amount of all pre-Effective Date Allowed Administrative Claims of the Debtors' counsel, co-counsel and accountants (principally professionals' fees) is expected to be approximately $60,000.00 on the Effective Date.

      4.1.2.    **Allowed Priority Tax Claims**.  The Debtors believe that there are six (6) Allowed Priority Tax Claims against the Debtors[2].

      4.1.2.1.  **IRS.**  On the Petition Date, the Debtors listed a disputed claim of the IRS in the amount of $1,084,000.52 arising out of tax liability from 2007 to date.  The IRS did file two Proofs of Claim before the Bar Date.  On July 28, 2014, the IRS filed a proof of claim, which claim was assigned Claim No. 9 in the Masons' Chapter 11 Case, and later amended on October 24, 2014. In its amended Claim No.9, the IRS asserts that it holds an aggregate claim of $768,976.99 against the Masons for civil penalty taxes.  The applicable tax periods begin on December 31, 2009, through December 31, 2013.  In these Claims, the IRS further asserted that of the $768,976.99, a total of $436,197.07 should be treated as a secured claim and $332,669.93 should be treated as an unsecured priority claim, and the remaining amount, $110.00 should be treated as an unsecured non-priority claim.

      On August 21, 2012, the IRS filed a proof of claim, which claim was assigned Claim No. 2 in the MRS Chapter 11 Case and later amended on September 30, 2014. In its amended Claim

---

[2]    While the Claims of Ohio County Sheriff's office should be deemed disallowed given the Court order, the Debtors agree that the Ohio County Sheriff should retain a $14,000 pre-petition lien on the Rehab Center.  The Debtors also agree to pay all post-petition tax liabilities to the Ohio County Sheriff.

No.2, the IRS asserts that it holds an aggregate claim of $436,578.06 against Medical Rehab Services for WT-FICA, FUTA, and CORP-INC taxes. The applicable tax periods begin on March 2, 2009, through June 30, 2014.  In this claim, the IRS further asserts that of the $436,578.06, a total of $215,801.37 should be treated as a secured claim and $198,347.03 should be treated as an unsecured priority claim, and the remaining amount, $22,429.66 should be treated as an unsecured non-priority claim.

The Debtors filed a Claims Objection to IRS Claim No. 2 and IRS Claim No. 9 (CM/ECF #149, filed on December 8, 2014).  The IRS believes it has a larger secured position given its asserted lien position on the Bello Vedere Property.  In the Lien Priority Adversary Proceeding in which the IRS is a named defendant, the Debtors sought a determination of the amount and extent of the IRS liens on the Rehab Center, MRS Assets, Masons' personal assets, and the Camelot Assets.

**Proposed Plan Treatment:**

The IRS shall have an Allowed Priority IRS Claim against the Debtors' estate in the approximate amount of $769,877.95.

Beginning on the first Business Date of the first month after the Effective Date, the Debtors propose to repay the Allowed Priority IRS Claim with the sum of $7,500/month for a period of seven (7) years.   At the expiration of the seven (7) years, any unpaid amounts of the Allowed Priority IRS Claim shall be deemed non-dischargeable.  Until full and final payments are made, the IRS shall retain any and all liens on the Debtors' assets.

All post-Petition tax liabilities of the Debtors will be paid by Trans Medical or the Debtors as they come due and will not be Administrative Claims against the Debtors.

If the Debtors substantially default on the Plan payments of any tax due to the IRS pursuant to Section 6.3 and 12.5 of this Plan, the entire tax debt still owed shall become due and payable immediately (including post-petition interest), and the IRS may collect these unpaid tax liabilities through their respective administrative collection provisions.

4.1.2.2. **Ohio County WV Sheriff Tax Office**.  On the Petition Date, the Debtors also listed a disputed priority claim of the Ohio County WV Sheriff Tax Office (personal property taxes) in the amount of $82,500 and the Ohio County WV Sheriff Tax Office (real estate taxes) in the amount of $28,103.66.

The Ohio County WV Sheriff Tax Office filed Proofs of Claim, assigned Claim No. 4 ($33.85) (personal property taxes on the 2011 Ford Escape, asserting a priority unsecured status), Claim No. 5 ($44,965.94) (real estate taxes on 134 Community Street Property, asserting a priority unsecured status on the whole claim), Claim No. 6 ($9,198.66); Claim No. 7 ($3,097.12), Claim No. 8 ($2,414.25).  The Debtors filed objections to these claims of the Ohio County WV Sheriff Tax Office (CM/ECF #233, filed on February 23, 2015) to which no response was filed and an order was entered disallowing the claims (CM/ECF#288, filed on April 5, 2015).    The WV

Auditor's Office on behalf of the Ohio County WV Sheriff Tax Office filed a motion to reconsider the Order disallowing the Claims.  The matter is still pending.

**Plan Treatment:**  The Ohio County WV Sheriff Tax Office shall have an Allowed Priority Ohio County WV Sheriff Tax Office Claim against the Debtors' estate in the amount of $50,000 (the estimated amount of unpaid pre-petition tax last payable on April, 2014).  On or before 60 (sixty) days after the Effective Date, the Debtors shall pay in full all outstanding Post-Petition taxes, in the amount of $22,960.72 which relate to 2015 taxes owing.  This payment shall be in full satisfaction of all outstanding Post-Petition taxes and the Debtors shall not be responsible for any post-petition interest and penalties on such post-Petition taxes.

Beginning on the first Business Date of the first month after the Effective Date, the Debtors propose to repay the Allowed Priority Ohio County WV Sheriff Tax Office Claim with the sum of $476.00/month for a period of seven (7) years, with zero post-petition interest accruing (unless there is a substantial default).   At the expiration of the seven (7) years, any unpaid amounts of the Allowed Priority Ohio County WV Sheriff Tax Office Claim are non-dischargeable and the Debtors shall still owe such amounts to the Ohio County WV Sheriff Tax Office.  Until full and final payments are made, the Ohio County WV Sheriff Tax Office shall retain any and all liens on the Debtors' assets.

All post-Petition tax liabilities of the Debtors will be paid by Trans Medical or the Debtors as they come due and will not be Administrative Claims against the Debtors.

If the Debtors substantially default on the Plan payments of any tax due to the Ohio County WV Sheriff Tax Office pursuant to Section 6.3 and 12.5 of this Plan, any unpaid portions of the Allowed Priority Ohio County WV Sheriff Tax Office Claim shall become due and payable immediately (including post-petition interest), and the Ohio County WV Sheriff Tax Office may collect these unpaid tax liabilities through their respective administrative collection provisions.

4.1.2.3  **Ohio Department of Taxation.** On the Petition Date, the Debtors also listed a disputed priority claim of the Ohio Department of Taxation (ODT) in the amount of $45,885.22 (Mason Schedules) and $38,074 (MRS Schedules).  ODT timely filed an asserted priority claim in the Masons' Chapter 11 Case for the sum of $45,610.63 (Claim. No. 19) and an asserted priority claim in the MRS Chapter 11 Case (Claim No. 11) for the sum of $18,805.80.

The Debtors filed an objection to claims of the ODT (CM/ECF#228, February 22, 2015).

**Proposed Plan Treatment:**

The ODT shall have an Allowed Ohio State Priority Tax Claim against the Debtors in the amount $23,291.00 and a Class 5 Allowed General Unsecured Claim against the Debtors in the amount of $18,805.80.  Beginning on  December 1, 2015, the Debtors propose to repay the Allowed Ohio State Priority Tax Claim with the sum of $520.00/month with three percent (3%) post-petition interest accruing), until paid in full and the Debtors shall mail such payment to Allison Archer, 15 West Superior Avenue, 11th Floor, Cleveland, Ohio 4413.  If such payment is not made timely, the ODT shall send a written notice of default consistent with this Plan, Section

6.3.  The 180-day opportunity to cure a default of non-payment as set forth in this Plan, Section 12.5, shall be reduced, as to the ODT Plan obligations only, to a 60-day cure period after Debtors' receipt of written notice of such default

If the Debtors default on the Plan payments of any tax due to the ODT pursuant to Section 6.3 and 12.5 of this Plan, any unpaid portions of the Allowed Ohio State Priority Tax Claim shall become due and payable immediately (including post-petition interest), and the ODT may collect these unpaid tax liabilities through their respective administrative collection provisions.  The ODT shall also receive a pro rata distribution from the Debtors' Class 5 Allowed General Unsecured Claims on its Allowed Class 5 General Unsecured Claim.

*State of Ohio BWC Insurance Fund*.  On the Petition Date, the Debtors also listed a disputed priority claim of the State of Ohio BWC Insurance Fund (workers compensation taxes) in the amount of $7,811.22 and (employer withholding taxes) in the amount of $38,074.32.  The State of Ohio BWC Insurance Fund did file a Proof of Claim by the Bar Date.  The State of Ohio BWC Insurance Fund filed an asserted priority claim in the Masons' Chapter 11 Case for the sum of $22,857.55 (Claim. No. 25) and an identical claim in the MRS Chapter 11 Case (Claim No. 11).

The Debtors filed an objection to claims of the State of Ohio BWC Claims (CM/ECF#268, March 16, 2015).  The Debtors and the State of Ohio BWC Insurance Fund have agreed that the State of Ohio BWC Insurance Fund has an Allowed General Unsecured Claim against the Debtors in the amount of $18,290.71.  A Stipulation and Agreed Order was entered on May 20, 2015 (CM/ECF #351) memorializing this agreement.

**Plan Treatment:**

The Ohio BWC Insurance Fund shall receive a pro rata distribution from the Debtors' Class 5 Allowed General Unsecured Claims on its Allowed Class 5 General Unsecured Claim.

**4.1.2.4 West Virginia State Tax Department Sales and Use Taxes**.  On the Petition Date, the Debtors also listed two disputed priority claims of the West Virginia State Tax Department ("WVSTD") (sales and use taxes) in the amount of $113,672.59 (against Camelot) and $128,865.02 (against Camelot).

The WVSTD on October 10, 2014 filed Proofs of Claim, Assigned Claim No. 5 (Medical Rehab Case) ($112,134.49, for withholding, franchise and income taxes, asserting $106,727.40 secured, and $4,275.72 unsecured priority), and Assigned Claim No. 12 (Masons Case) ($308,489.40, asserting $298,814.88 secured, and $5,989.50 unsecured priority, and $3,685.02 unsecured non-priority).  The Debtors file an objection to the claims of WVSTD (CM/ECF#261, filed on March 11, 2015).

**Proposed Plan Treatment:**

The WVSTD shall have an Allowed Priority WVSTD Claim against the Debtors' estate in the amount of $320,515.  The WVSTD shall also have an Allowed Class 5 General Unsecured Claim in the amount of $1,778.

Beginning on the first Business Date of the first month after the Effective Date, the Debtors propose to repay the Allowed Priority WVSTD Claim with the sum of $2,000/month for a period of seven (7) years, with zero interest accruing.   At the expiration of the seven (7) years, any unpaid amounts of the Allowed Priority WVSTD Claim shall be deemed non-dischargeable.  Until full and final payments are made, the WVSTD shall retain any and all liens on the Debtors' assets for a period of ten (10) years after the Effective Date of this Plan.   All post-Petition tax liabilities of the Debtors will be paid by Trans Medical or the Debtors as they come due and will not be Administrative Claims against the Debtors.

If the Debtors substantially default on the Plan payments of any tax due to the WVSTD pursuant to Section 6.3 and 12.5 of this Plan, the entire tax debt still owed shall become due and payable immediately (including post-petition interest), and the WVSTD may collect these unpaid tax liabilities through their respective administrative collection provisions.

*City of Wheeling*.

On the Petition Date, the Debtors also listed a disputed priority claim of the City of Wheeling (B&O Taxes) in the amount of $35,800.  The City of Wheeling timely filed an asserted priority claim in the MRS Chapter 11 Case (Claim No. 16) for the sum of $35,800.

The Debtors filed an objection to claim of the City of Wheeling (CM/ECF#224, February 20, 2015).  The Debtors and the City of Wheeling entered into a Stipulation and Agreed Order (CM/ECF#291, filed on April 2, 2015), pursuant to which the City of Wheeling was deemed to hold an Allowed Priority Unsecured Claim in the amount of $9,146 and an Allowed Class 5 General Unsecured Claim in the amount of $26,653.

**Plan Treatment:**

Beginning on the first Business Date of the first month after the Effective Date, the Debtors propose to pay the City of Wheeling the sum of $58/month commencing on the Effective Date for a period of seven (7) years.   At the expiration of the seven (7) years, any unpaid amounts of the Allowed Priority City of Wheeling Claim shall be dischargeable.  All post-Petition tax liabilities of the Debtors will be paid by Trans Medical or the Debtors as they come due and will not be Administrative Claims against the Debtors.

If the Debtors substantially default on the Plan payments of any tax due to the City of Wheeling pursuant to Section 6.3 and 12.5 of this Plan, the entire tax debt still owed shall become due and payable immediately (including post-petition interest), and the City of Wheeling may collect these unpaid tax liabilities through their respective administrative collection provisions.

The City of Wheeling shall also receive a pro rata distribution from the Debtors' Class 5 Allowed General Unsecured Claims on its Allowed Class 5 General Unsecured Claim.

**4.2.**     **Class 1 (Enterprise Bank Claim)**

4.2.1.   Class 1 consists of the Allowed Claims of Enterprise Bank arising from the Enterprise Bank Loans 1 and 2.  To the extent that the principal balance of the Allowed Claims of Enterprise Bank have been reduced by post-Petition Date payments made by the Debtors to Enterprise Bank, the Debtors shall receive a credit for such payments.  The Enterprise Bank Loans 1 and 2 are secured by a first Lien position on the 1 Community Street Property, Camelot Assets and Medical Rehab Assets, together with lien position on  the 113 Bello Vedere Property.

4.2.2.   The Debtors scheduled Enterprise Bank as having a secured claim in the amount of $1,984,198.  Enterprise Bank filed proofs of claim in each of the Debtors' Cases (Assigned Claim No. 10 in the Medical Rehab Case and assigned Claim No. 23 in the Masons Case) asserting a pre-petition claim in the amount of $1,946,377.40, and marking the secured portion as "Unknown".

**Plan Treatment:**

4.2.3. Enterprise Bank shall have an Allowed Secured Claim in the total amount presently due under the Enterprise Loan Documents which, as of June 30, 2015, was estimated to be $2,000,000.  Enterprise is oversecured and shall have added to its allowed secured claim all unpaid post-petition interest at the rates set forth in the Enterprise Loan Documents, costs and expenses, including reasonable attorneys' fees pursuant to Section 506(b) of the Bankruptcy Code.

On the Effective Date, the Enterprise Loans shall be deemed reinstated subject to the terms of this Plan.  All liens and security interests of Enterprise granted to Enterprise Bank under the Enterprise Loan Documents in the priorities set forth in this plan shall be retained and shall continue to secure the Enterprise Loans until the Enterprise Loans have been repaid in full, all in the priorities recited herein.   The terms and conditions of the Enterprise Loan Documents including, without limitation, interest rates, events of defaults, covenants, cure rights, and remedies, shall continue to apply and govern with respect to repayment of the Enterprise Loans expressly as expressly modified under the Plan.   Any terms contained in this Plan or the Confirmation Order which are inconsistent with the terms of the Enterprise Loan Documents shall not apply to the treatment of the Secured Claim of Enterprise Bank.  For the avoidance of doubt, any notice and/or cure provisions set forth in this Plan which are longer than those set forth in the Enterprise Loan Documents shall not apply to Enterprise Bank.

Enterprise Bank shall retain (or otherwise obtain) a second Lien position on the 1 Community Street Property (behind only the Ohio County Sheriff's Office), Trans Medical Assets, Camelot Assets and Medical Rehab Assets, together with a lien position on the 113 Bello Vedere Property, to secure the Reorganized Debtors' obligations under this Plan and the Enterprise Bank Loan Documents.

4.2.4.   Commencing on the Effective Date, the Debtors shall make monthly payments on the Enterprise Loans in the fixed amount of $21,000 per month, payable on or before the first (1st) day of each month provided that prior to the Effective Date the Debtors shall continue to make all of the required adequate protection payments to Enterprise Bank.  The payments shall be allocated

as follows:  ($8,800) on the Business Loan and ($12,200) on the SBA Loan.  The Enterprise Loans shall be due and payable in full on their stated maturity dates as set forth in the Enterprise Loan Documents which the Debtors acknowledge are April 5, 2019 for the Business Loan (Enterprise Loan 2) and April 5, 2027 for the SBA Loan (Enterprise Loan 1).  It is anticipated that there will be balloon balances due on the Enterprise Loans at maturity as a result of interest deferrals, interest rate adjustments and the accrual of fees and costs incurred by Enterprise both prior to and after the Effective Date which the Debtors shall be required to satisfy at maturity.  Upon repayment in full of the Business Loan (including any balloon payment) whether at maturity or otherwise, the monthly payment shall be reduced to $12,400 until the balance due on the SBA Loan (Enterprise Loan 1) is paid in full.  Upon the maturity of Enterprise Loan 2, provided that the Debtors are not in default under this Plan or the Enterprise Loan Documents, Enterprise shall in good faith consider a request by the Debtors to "term out" the balloon balance of Enterprise Loan 2 provided that such extension shall be subject to credit approval, customary underwriting standards and is otherwise based on commercially reasonable terms.

4.2.5.    Prior to the Effective Date, the Debtors shall cause Trans Medical to enter into a loan assumption agreement, security agreement and other documents as may be reasonably requested by Enterprise Bank, all in form and substance acceptable to Enterprise Bank, pursuant to which Trans Medical shall become a co-borrower on the Enterprise Loans and shall grant Enterprise Bank a first-priority lien and security interest in and to all of its assets as security for the Enterprise Loans.  The Debtors shall execute any and all additional documents or agreements as may be reasonably requested by Enterprise Bank in order to implement the terms of this Plan.

4.2.6.    Upon payment of the Enterprise Loans in full, Enterprise Bank shall, at the written request of the Debtors, release all liens against the Debtors, Trans Medical, and Camelot, and shall mark all promissory notes and other loan documents pertaining to the Enterprise Bank Loans 1 and 2, as fully paid and satisfied.  Enterprise Bank shall cause to be recorded a satisfaction piece regarding its Liens on the Medical Rehab Assets, Trans Medical Assets, and Camelot Assets if required by applicable non-bankruptcy law.

4.2.7.    Claim 1 is impaired by the Plan and Enterprise Bank is entitled to vote for or against the Plan.

### 4.3    Class 2 (Belmont Savings Bank Home Loan)

4.3.1.  Class 2 consists of the Allowed Belmont Savings Bank Home Loan Secured Claim of Belmont Saving Bank.  For the purposes of this Plan, Belmont Savings Bank is deemed to hold an Allowed Secured Claim of $448,919.33, plus any allowed accrued and unpaid interest and allowable unreimbursed costs, fees and expenses, and other charges payable under the provisions of the Belmont Savings Bank Home Loan Documents.  To date, Belmont Savings Bank has not asserted any unreimbursed costs (including attorney's fees).

4.3.2.    The Allowed Secured Claim of Belmont Saving Bank has been reduced by post-Petition Date payments made by the Debtors to Belmont Savings Bank.  The current amount outstanding is estimated to be approximately $436,000.  The Belmont Savings Bank Home Loan

was secured by a Lien position in the 113 Bello Vedere Property. Belmont and the IRS both asset competing first liens on the Bello Vedere Property. This lien dispute was the subject of the Lien Priority Adversary Proceeding.

      4.3.3.   The Debtors shall pay the Belmont Savings Bank Home Loan Secured Claim in its ordinary course according to the terms of the Belmont Savings Bank Home Loan Documents. In respect of unreimbursed costs, fees and expenses, and other charges, the Debtors reserve the right to object to the allowance of the same and will require Belmont Savings to prove at any hearing on a § 506(b) motion, if filed. The Allowed amount of unreimbursed costs, fees and expenses, and other charges under § 506(b) of the Code will be paid by the Debtors in accordance with any Court order approving allowance of the same.

      4.3.4.   The Allowed Belmont Savings Bank Home Loan Secured Claim is unimpaired by the Plan and its holder is not entitled to vote on the Plan.

**4.4.**     **Class 3 (Belmont Saving Bank Car Loan)**

      4.4.1.  Class 3 consists of the Allowed Belmont Savings Bank Car Loan Secured Claim of Belmont Savings Bank. For the purposes of this Plan in respect of a car, Belmont Savings Bank is deemed to hold an Allowed Secured Claim of $13,761, plus any allowed accrued and unpaid interest and allowable unreimbursed costs, fees and expenses, and other charges payable under the provisions of the Belmont Savings Bank Car Loan Documents. To date, Belmont Savings Bank has not asserted any unreimbursed costs (including attorney's fees).

      4.4.2.   The Allowed Secured Claim of Belmont Savings Bank has been reduced by post-Petition Date payments made by the Debtors to Belmont Savings Bank. The Belmont Savings Bank Car Loan was secured by a Lien position in the Debtor's 2012 Ford Escape.

      4.4.3.   The Debtors shall pay the Belmont Savings Bank Car Loan Secured Claim in its ordinary course according to the terms of the Belmont Savings Bank Car Loan Documents. In respect of unreimbursed costs, fees and expenses, and other charges, the Debtors reserve the right to object to the allowance of the same and will require Belmont Savings to prove at any hearing on a § 506(b) motion, if filed. The Allowed amount of unreimbursed costs, fees and expenses, and other charges under § 506(b) of the Code will be paid by the Debtors in accordance with any Court order approving allowance of the same.

      4.4.4.   The Allowed Belmont Savings Bank Car Loan Secured Claim is unimpaired by the Plan and its Holder is not entitled to vote on the Plan.

**4.5.**    **Class 4 (Priority Claims)(non-tax)**

      This class is reserved for any Priority non-tax Claims. Except as to certain taxes set forth above, there are no filed or scheduled Priority Claims but the Debtors reserve the right to include same if allowed as tardily filed by the Court (in which case same shall be treated in accordance with the Code). The Debtors also reserve the right to object to any Class 4 claim and to the extent

that such claim should be treated as a general unsecured claim; the Debtors will object thereto for purposes of reclassification. Any Allowed Class 4 Claims will be paid in full as of the Effective Date of this Plan, unless the Holder of such Allowed Priority Claim (non-tax) agrees to be treated differently. Any Allowed Priority Claim (non-tax) shall be unimpaired by the Plan and its Holder not entitled to vote on the Plan.

### 4.6.    Class 5 (General Unsecured Claims)

4.6.1.   Class 5 consists of the Allowed General Unsecured Claims. As of the original filing date of this Plan, the total amount of filed, unscheduled unsecured claims (for which a proof of claim was timely filed) and unsecured claims scheduled so that no proof of such claim was required, was approximately $539,516.01 (excluding the Medical Rehab Shareholder Loan Claim and including the Acquired Capital Disputed Claim). This amount includes, where applicable, the amount claimed on a proof of claim if such amount is greater than the amount appearing on the Debtors' schedules. The Debtors preserve the right to adjudicate disputed claims against their estate. The Debtors have filed its First Omnibus Objection to Claim (CM/ECF#300, filed on April 8, 2015) and an order was entered granting such claim in part (CM/ECF#402, filed on June 12, 2015). The Debtors also filed a Second Omnibus Objection to Claims (CM/ECF#467, on August 7, 2015); and an order was entered granting such claims objection (CM/ECF#528, on September 15, 2015).

4.6.2. The Allowed amount of Class 5 claims totals $301,283.80. See Updated Disclosure Statement Attachment B-Schedule of General Unsecured Claims in Class 5.

**Plan Treatment:**

4.6.3.   Beginning on the first Business Date of the first month after the Effective Date, the Debtors shall make monthly payments of $700 to be distributed *pro rata* to any Holders of Allowed General Unsecured Claims for a period of five (5) years, resulting in a total aggregate distribution to Class 5 in the amount of $42,000 (or a 14% distribution).

4.6.4. Holders of Allowed General Unsecured Claims are impaired by the Plan and are entitled to vote on the Plan.

### 4.7.    Class 6 (Interest Holders)

Class 6 consists of all Interest Holders of the Medical Rehab. The Interest Holders shall retain their interest in the Medical Rehab. Holders of Class 6 Claims are not impaired by the Plan and are deemed to accept the Plan.

### 4.8.    Class 7 (Medical Rehab Shareholder Loan)

4.8.1.   Class 7 consists of the Allowed Claim of Medical Rehab. As of the Petition Date, the total amount of this Class 8 Claim was $684,590 constituting an unsecured loan made by

Medical Rehab on a continuing basis to Terry Mason so that Terry Mason, could, *inter alia*, fund
operating capital and renovation and construction costs for Camelot.

4.8.2.   Under this Plan, no distribution shall be made to the Holder of the Class 7 (Medical
Rehab Shareholder Loan).

4.8.3.   The Holder of the Allowed Class 7 (Medical Rehab Shareholder Loan) Claim is
impaired by the Plan. For the purposes of any possible cram-down pursuant to 11 U.S.C. § 1129,
the vote of the impaired Class 7 (Medical Rehab Shareholder Loan) will not be counted because
of Medical Rehab's insider status in respect of Debtor Terry Mason.  To the extent acceptance of
Class 7 is required, Class 7 has been deemed to have accepted the Plan.

**4.9.     Class 8 (Acquired Capital Disputed Unsecured Claim)**

INTENTIONALLY OMITTED

**ARTICLE V
IMPLEMENTATION OF THE PLAN**

5.1.     **Funding of the Plan.** This Plan provides for, *inter alia*, the modification of certain
defaulted loans, as well as, the continuation of the payment of certain other non-defaulted secured
loans.  The Plan shall be funded by a few different revenue streams.  See Updated Disclosure
Statement Attachment C- Anticipated Monthly Budget for the five (5) years following the
Effective Date.

First, as stated above, OVMC now operates an outpatient location at the Rehab Center.
Trans Medical provides therapists (including Terry Mason) to OVMC, pursuant to terms of that
certain OVMC-Trans Medical Services Agreement that has been approved by this Court.  TMS
will contribute approximately $4,800/month of its revenue to funding the plan from this Services
Agreement.

Second, OVMC, leases a significant portion of the Facility from Mr. Mason, individually
for the purposes of operating of its Outpatient Department, pursuant to the terms of a certain
OVMC/Mason Lease Agreement, which also was Court approved.   Mr. Mason receives $10,052
a month from the OVMC/Mason Lease Agreement.

Third, in addition to services rendered to OVMC patients, Terry Mason, individually, and
Tracey Mason, individually, will continue to render services to their own client base through Trans
Medical as employees.  They will each earn $3,750/month as salary.

Fourth, another $62,400 a month will be taken from TMS as a distribution to fund the Plan;
Mrs. Mason is the 90% owner of TMS.

Lastly, Trans Medical will lease out a certain portion of the Facility as well from Mr.
Mason, individually, pursuant to the terms of a certain "Trans Medical Lease Agreement".  Mr.

Mason will receive rent in the amount of $14,043 which will also be used to fund the plan.

Additional funding contributions may come from third parties and additional income from the Debtors.

5.2.    **Possession of Assets**. Except as provided otherwise in this Plan, the Debtors shall remain in possession of all of their Assets and they do not intend to sell any Assets at this time.

5.3.    **Execution of Documents.** Prior to the Effective Date, the Debtors are authorized and directed to execute and deliver all documents and to take and to cause to be taken all action necessary or appropriate to execute and implement the provisions of this Plan.

5.4.    **Post-Petition Professionals.**  The Debtors may employ legal counsel without seeking Court approval to assist in the Debtors' duties hereunder and pay such reasonable legal counsel fees as and when such fees become due for payment.

5.5.    **Final Decree.**  After the Effective Date, the Debtors may file a motion to close the case and request that a final decree be issued. The Debtors shall file all required reports and pay any required fees to the Office of the United States Trustee.

5.6.    **Retention and Enforcement of Claims and of Actions; Objections to Claims.** Pursuant to § 1123(b) (3) (B) of the Bankruptcy Code, the Debtors shall retain and may enforce any and all claims and Actions of the Debtors on behalf of, and as a representative of, the Debtors or their Estate, including, without limitation, all claims arising or assertable at any time under the Bankruptcy Code, including under 11 U.S.C. §§ 510, 542, 543, 544, 545, 547, 548, 549, 550, 552 and 553 thereof.  The Debtors preserve the right to adjudicate Disputed Claims against its Estate through a claims objection process.

5.7.    As required by Bankruptcy Code § 1129(a)(4), all payments made or to be made for services or for costs and expenses in or in connection with the Case, or in connection with the Plan and incident to the Case are subject to the approval of this Court as reasonable. To the extent that any such payment is not subject to the procedures and provisions of Bankruptcy Code §§ 326 through 330, then such Court approval shall be deemed to have been given through entry of the Confirmation Order unless, within 30 days of any such payment or request for such payment, the Court, the Debtors, the United States Trustee or the party making the payment challenges or seeks approval of the reasonableness of such payment; no other parties or entities shall have standing to make such challenge or application for approval.  Nothing in this provision shall affect the duties, obligations and responsibilities of any entity under Bankruptcy Code §§ 326 through 330.

5.8.    Other than payments under the Plan by the Debtors on the Effective Date, the Reorganized Debtor shall be the Disbursing Agent herein.  The Disbursing Agent shall have the sole and exclusive right to make the distributions required by the Plan provided, however, that the Disbursing Agent shall be required to make the distributions and payments provided for herein. The Disbursing Agent may hold or invest the funds in one or more accounts, provided that all investments shall be made in accordance with 11 U.S.C. § 345.  The Reorganized Debtors shall

not be compensated for their efforts as the Disbursing Agent but may engage professionals to assist them as the Disbursing Agent.

5.9.   The payments, distributions and other treatments provided in respect of each Allowed Claim in the Plan shall be in full settlement and complete satisfaction discharge and release of such Allowed Claim, except as otherwise provided in any post-Effective Date loan documents (including the Enterprise Bank Loan Documents) or decelerated and reinstated loan documents.

5.10.   Notwithstanding any of the provisions of the Plan specifying a date or time for the payment or distribution of consideration hereunder, payments and distributions in respect of any Claim which at such date or time are Disputed Claims, shall not be made pursuant to Article VII hereinafter.

**ARTICLE VI**
**PROVISIONS GOVERNING DISTRIBUTIONS**
**AND GENERAL PROVISIONS**

6.1.   **Distributions.**  Distributions pursuant to this Plan shall be made by the Debtors and Reorganized Debtors as provided herein and shall be made, unless otherwise provided herein, on the Effective Date, or as soon as practicable thereafter or as may be otherwise ordered by the Court.

a.   Delivery of Distributions.  Distributions and deliveries to each Holder of an Allowed Claim as provided by the Plan shall be made: (i) at the address set forth on the Schedules; or (ii) at the address set forth on the proof of claim or any amendment thereof filed by or on behalf of such Holder, if different from clause (i).  If any holder's distribution is returned as undeliverable, no further distributions to the holder will be made unless and until the Reorganized Debtors is notified of the holder's then current address, at which time all missed distributions will be made to the holder without interest.  All Claims for undeliverable distributions must be made to the Reorganized Debtors on or before the later of (i) the first anniversary of the Effective Date, or (ii) ninety (90) days after the respective distribution was made.  After that date, all Unclaimed Property will become property of the Reorganized Debtors, and the Claim of any holder with respect to such property will be discharged and forever barred.

b.   Means of Cash Payment.  Cash payments made pursuant to the Plan will be in United States funds, by check drawn on a domestic bank or by wire transfer from a domestic bank.  All Cash distributions will be made by the Debtors or Reorganized Debtors, as provided for in the Plan.

c.   Setoffs.  Except as otherwise provided in post-Effective Date loan documents (including the Enterprise Bank Loan Documents), the Debtors or Reorganized Debtors may, but will not be required to, set off against any Claim and the payments to be made pursuant to the Plan in respect of the Claim, any claims of any nature whatsoever the Debtors or Reorganized Debtors may have against the claimant, but neither the failure to do so nor the allowance of any

Claim hereunder will constitute a waiver of release by the Reorganized Debtors of any such claim the Debtors or Reorganized Debtors may have against such claimant.  Any claimant as to which the Debtors or Reorganized Debtors seeks a setoff may challenge any such setoff in the Bankruptcy Court.

        d.    <u>De Minimis Distributions</u>.  The Debtors or Reorganized Debtors shall not make any Cash payment of less than twenty-five dollars ($25.00) to any creditor <u>unless</u> a request is made in writing to make such a payment to the Debtors or Reorganized Debtors, whoever is applicable.

        e.    <u>Saturday, Sunday or Legal Holiday</u>.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but will be deemed to have been completed as of the required date.

    6.2.   **Notices.**  Any notice described in or required by the terms of this Plan or the Code and Bankruptcy Rules shall be deemed to have been properly given when actually received, or if mailed, five (5) days after the date of mailing as such may have been sent by certified  mail, return receipt requested, and if sent to:

        (a)    If to the Debtors or Reorganized Debtors, addressed to:

                1 Community Street
                Wheeling, West Virginia 26003
                Attn: Terry Mason

        (b)    With copies to Counsel:

                Salene Mazur Kraemer, Esquire
                Amy Kerr Parker, Esquire
                MAZURKRAEMER BUSINESS LAW
                603 Washington Road, Suite 500
                Pittsburgh, PA 15228
                salene@mazurkraemer.com
                amy@mazurkraemer.com

    6.3   **Default.**  Except as otherwise provided under the provisions of the Plan or in any post-Effective Date loan documents (including the Enterprise Bank Loan Documents), no default shall be declared under this Plan unless and until any payment due under this Plan has not been made within thirty (30) days after written notice setting forth the specific provision of the Plan involved and the method of cure sought to the Reorganized Debtors and counsel for the Debtors, subject to the cure provisions of Section 12.5 of this Plan..

    6.4   **Compliance with Plan.**  Subject to the terms of any post-Effective Date loan documents (including the Enterprise Bank Loan Documents), the Reorganized Debtors may

reinvest, use for capital improvements, reserve or distribute any cash flow in excess of what is required for current Plan payments so long as there is no default under Plan.

# ARTICLE VII
## PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS

7.1.   **Disputed Claims**.

7.1.1.   For purposes of this Plan, any and all Claims that are subject to disallowance pursuant to Code §§ 502(e) and 509 shall be deemed to be disallowed as of the Confirmation Date, notwithstanding the absence of any objection thereto.

7.1.2.   Except as otherwise provided in the Plan, no payments shall be made with respect to any portion of a Disputed Claim unless and until any and all objections to such Disputed Claim or Actions against the Holder of a Disputed Claim have been determined by a Final Order. However, payment shall be made with respect to any undisputed portion of a Disputed Claim. Payments and distributions to each Holder of a Disputed Claim, to the extent that the Disputed Claim ultimately becomes an Allowed Claim, shall be made in accordance with the provisions of the Plan.  Any payments that would have been made prior to the date on which a Disputed Claim becomes an Allowed Claim shall be made as soon as practicable after the date that the order or judgment of the Court determining such Claim to be an Allowed Claim becomes a Final Order.

7.2.   **Claims Objections Which Are Pending As of The Effective Date**.   Claims objections may be filed by the Plan Proponent.  Claims objections which are pending on the Effective Date may be prosecuted only by the Plan Proponent after such date unless the Claim is deemed Allowed under the Plan.  The Plan Proponent shall have the discretion to litigate to judgment, settle (without notice and approval by the Court pursuant to Bankruptcy Rule 9019) or withdraw objections to Disputed Claims.

7.3.   **Post-Confirmation Date Objections**.   After the Confirmation Date, only the Reorganized Debtors may make and file objections to proofs of claim for any claims that are not deemed allowed under this Plan.  Any such objections to Claims shall be filed with the Court at any time within ninety (90) days after the Effective Date.  Such Plan Proponent shall have the discretion to litigate to judgment, settle, without notice or approval of the Court, or withdraw its objections.

# ARTICLE VIII
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

8.1.   **Executory Contracts And Unexpired Leases**.

8.1.1.   Except with respect to a Service Agreement with Wheeling Linen Service, Inc., the Debtors are no longer a party to any pre-petition executory contracts and unexpired leases, as set forth in the Schedules.  Any and all executory contracts and unexpired leases that have not

been assumed prior to the Effective Date shall be deemed rejected as of the Effective Date.  Unless otherwise agreed to by any counterparty to an Executory contract or unexpired lease, the Debtor shall pay all cure amounts due on the Effective Date.

        8.1.2.   To the extent that any executory contracts and unexpired leases are deemed rejected or have been rejected, any Allowed Claims arising out of the rejection of any executory contract or unexpired lease shall be treated in accordance with the provisions relating to Class 5 Claims (General Unsecured Claims).  Any executory contracts and unexpired leases rejected must file a Rejection Claim by the Rejection Claims Bar Date.

        8.1.3.   Objections to Rejection Claims may be filed with the Court by the Debtors at any time prior to the thirtieth (30th) day following the Effective Date.  Such objections shall be served upon the Holder of the Claim to which an objection is made.  Any objection not timely filed shall be deemed waived by all parties-in-interest.

## ARTICLE IX
## DISCHARGE, EXCULPATION AND INJUNCTION

    9.1.    **Injunction, Discharge And Exculpation Of Claims**.

    **9.1.1.**    **Exculpation Of Liability**.  **Debtors' attorneys and financial advisors, and the Debtors' trustee(s), officers and directors shall not have or incur any liability to any Person for any act taken or omitted to be taken in good faith prior to or after the Effective Date (but after the Petition Date) in connection with the Case or related to the formulation, preparation, dissemination, implementation, confirmation or consummation of the Plan, the Disclosure Statement, or any other contract, instrument, release, agreement or other document created or entered into, or any act taken or omitted to be taken prior to or after the Effective Date in connection with the Plan or the Case, including, without limitation, any pleadings filed with, or actions taken in, the Court in connection with the Case or the formulation, preparation, dissemination, implementation, confirmation or consummation of the Plan and the Disclosure Statement; provided, however, that the foregoing provision of section 8.1 of the Plan shall have no effect on the liability of any Person that would otherwise result from any such act or omission to the extent that such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence.**

    9.2.    **Other Documents And Actions**.  The Reorganized Debtors may cause any other party to execute documents that are or may be necessary to effectuate the transactions provided for in this Plan.  The Reorganized Debtors or their representatives or agents shall take such other actions as may be necessary or appropriate to effectuating the terms of the Plan.

    9.3.    **Effect of Confirmation Order; Discharge**.  Except as provided in § 1141(d) of the Bankruptcy Code, in the Enterprise Loan Documents and as otherwise provided in the Plan, the provisions of the Plan and the Confirmation Order shall bind the Reorganized Debtors and all Holders of Claims or Interests.

**a. Medical Rehab Services.** As to the corporate Debtor Medical Rehab Services, Ltd., the Confirmation Order shall be a judicial determination of discharge of all debts of the Medical Rehab Services, Ltd. that arose before the Confirmation Date and any liability on a Claim that is determined under § 502 of the Bankruptcy Code as if such Claim had arisen before the Confirmation Date, whether or not a proof of claim based on any such date or liability is filed under § 501 of the Bankruptcy Code and whether or not a Claim based on such debt or liability is allowed under § 502 of the Bankruptcy Code and whether or not such holder is impaired under the Plan and whether or not such holder has accepted the Plan, and shall terminate all rights, claims and interests of such holder, except as provided in the Plan.

**b. Terrence and Tracey Mason.** As to the individual Debtors Terrence Mason and Tracey Mason, in accordance with 11 U.S.C. § 1141(a)(5)(A) or unless otherwise provided for in 11 U.S.C. § 1141(d)(5)(B),the confirmation of the Plan shall not yet discharge any of the Masons' debts in the Plan, but the debts will only be discharged after Terrence Mason and Tracey Mason have made all required payments under the Plan during the seven (7) years following the Plan's Effective Date; **provided, however**, that as to the claims of Enterprise Bank and Belmont Savings Bank, no discharge shall be granted unless and until such claims have been pain in full in accordance with the terms of the Plan including the terms of any extensions, if any, agreed to by the Debtors and Enterprise Bank and Belmont Savings Bank after the Effective Date.

After Plan payments have commenced and the case is fully administered, the Reorganized Debtors will request that the case be closed as provided in 11 U.S.C. § 350 and Bankruptcy Rule 3022. Notice of closing the Chapter 11 Case of Terrence Mason and Tracey Mason **without discharge** will be given to parties in interest pursuant to Bankruptcy Rule 4006. After all Plan payments have been made during the seven (7) years following the Plan's Effective Date or unless as otherwise provided in 11 U.S.C. § 1141(d)(5)(B), the Reorganized Debtors may move to reopen the case pursuant to 11 U.S.C. 350(b), file an accounting demonstrating the plan payments that have been made, and request entry of discharge; after which, the Court may close the case again.

The entry of discharge against the Masons shall be a judicial determination of discharge of all debts of the Masons that arose before the Confirmation Date and any liability on a Claim that is determined under § 502 of the Bankruptcy Code as if such Claim had arisen before the Confirmation Date, whether or not a proof of claim based on any such date or liability is filed under § 501 of the Bankruptcy Code and whether or not a Claim based on such debt or liability is allowed under § 502 of the Bankruptcy Code and whether or not such holder is impaired under the Plan and whether or not such holder has accepted the Plan, and shall terminate all rights, claims and interests of such holder, except as provided in the Plan.

**ARTICLE X**
**MODIFICATION OF THE PLAN**

10.1.  **Modification Before The Confirmation Date**. The Plan Proponent, exclusively, may modify the Plan at any time before the Confirmation Date provided that the Plan, as modified, meets the requirements of Code §§ 1122 and 1123. Once the Plan Proponent files a modification with the Court in accordance with this section 10.1 of the Plan, the Plan, as modified, becomes the

Plan. If any material modification to the Plan is made after the solicitation package is sent out, but before the confirmation hearing, the Debtors will file a motion to determine if resolicitation is necessary.

10.2. **Modification After The Confirmation Date**. The Plan Proponent, exclusively, may modify the Plan at any time after the Confirmation Date and before the Effective Date, provided that the Plan, as modified, meets the requirements of Code §§ 1122 and 1123 and so long as it does not materially or adversely affect the interest any creditors. After the Effective Date and before substantial consummation of the Plan, only the Plan Proponent may modify the Plan (and, in accordance with Code §1127(e), whether or not the Plan has been substantially consummated), provided that the Plan, as modified, meets the requirements of Code §§ 1122 and 1123. Any modification addressed in this paragraph may only be made with authorization from the Court after notice and a hearing.

10.3. **Defects, Omission, And Inconsistencies**. Before the Effective Date, the Plan Proponent may, with the approval of the Court, remedy any defect or omission, or reconcile or correct any inconsistencies in the Plan or amend the Plan in such manner as may be necessary to carry out the purpose and effect of the Plan, so long as it does not materially or adversely affect the interest of any Holders of Allowed Claims and Interests. After the Effective Date, the Plan Proponent may remedy any defect or omission, or reconcile or correct any inconsistencies in the Plan or amend the Plan in such manner as may be necessary to carry out the purpose and effect of the Plan, so long as it does not materially or adversely affect the interest of creditors.

## ARTICLE XI
## RETENTION OF JURISDICTION

Following the Effective Date, and notwithstanding the entry of the Confirmation Order, the Court shall retain and have jurisdiction to the extent allowable by law or applicable law, for the following purposes:

11.1. To enable the consummation of the Plan and to resolve any disputes arising with respect thereto;

11.2. To enable the Plan Proponent or any other party to consummate any and all proceedings which it may bring prior to the entry of the Confirmation Order;

11.3. To set aside any and all Liens, levies and encumbrances as required by the Plan;

11.4. To hear and determine the Actions or adversary proceedings, including any and all claims, causes and actions seeking to: (i) recover any transfers, assets or damages which the Debtors, the Estate or any other party may be entitled to assert; and (ii) prosecute or recover money or property of the Estate under applicable provisions of the Code, including, without limitation, any avoidance actions brought by the Debtors pursuant to Code §§ 545, 546, 548, or 549 or other federal, state or local law;

11.5.    To adjudicate all controversies concerning any Actions, the Auction, any sale, valuation of Collateral for, classification, subordination or allowance of any Claim or Interest;

11.6.    To hear and determine all Claims arising from the rejection of any executory contracts or unexpired leases;

11.7.    To fix, estimate and/or liquidate any Claims which are disputed, contingent, or unliquidated;

11.8.    To determine any and all objections to the allowance of Claims or Interests;

11.9.    To consider and act on the compromise and settlement of any Claim or cause of action by or against the Estate, respectively;

11.10.  To adjudicate all Claims to a security interest in or Lien on any Assets of Debtors or in any proceeds thereof.

11.11.  To determine extent priority or validity of Liens on Assets of the Debtors.

11.12.  To recover all Assets and property of the Debtors or the Estate wherever located and to audit or require an accounting of any party that held Assets or property of the Estate;

11.13.  To adjudicate and determine any cause of action including the Actions provided for under the Plan;

11.14.  To hear and determine any and all controversies regarding any releases, waivers, and guarantees affected by the Plan;

11.15.  To hear and determine any and all motions to assume and assign any executory contract or unexpired lease;

11.16.  To make such orders as are necessary or appropriate to carry out the provisions of this Plan;

11.17.  To consider any modifications of the Plan, remedy any defect or omission or reconcile or correct any inconsistency in the Plan or in any order of the Court, including the Confirmation Order;

11.18.  To adjudicate and determine any and all adversary proceedings permitted under the Code;

11.19.  To hear and determine all fee applications and fee disputes regarding Professional Fees and objection to allowance of Administrative Claims;

11.20.   To issue injunctions, enter and implement other orders or to take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation or enforcement of this Plan; and

11.21.   To enter an order closing the Case and hear and determine any matter related hereto.

## ARTICLE XII
## GENERAL PROVISIONS

12.1.   **Title to Assets**.  Except as otherwise set forth in the Plan, and in accordance with Code § 1141, all Assets of the Estate shall revest in the Reorganized Debtors as of the Effective Date free and clear of all interests, Liens, claims and encumbrances.

12.2.   **No Levy**.  To the fullest extent allowed by applicable law, the distributions made pursuant to this Plan shall not be subject to levy, garnishment, attachment or like legal process by any Person by reason of any claimed subordination agreement, right to avoid payments or transfers, guaranties or otherwise (unless specifically provided for under this Plan), so that each Holder of an Allowed Claim will have and receive the full benefit, if any, of distributions provided under this Plan.

12.3.   **Interest Payments**.  All Holders of Allowed Claims hereby waive any and all interest, late charges, penalties, attorneys' fees, court costs, and any other such charges of any kind arising from or related to such Claims not expressly provided for in this Plan.

12.4.   **Filing Of Additional Documents**.  On or before the Effective Date, the Plan Proponent may file with the Court such agreements and other documents including a Plan Supplement which may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.  In addition, the Court, to the extent necessary, shall direct any party or Person to execute all appropriate documents and instruments to implement or further the provisions of the Plan.

12.5.   **Cure of Default**. Except as otherwise provided under provisions of the Plan or in any post-Effective Date loan documents (including the Enterprise Bank Loan Documents), no default shall occur under this Plan unless and until the Reorganized Debtors and its counsel shall have received written notice of default setting forth the specific provision of the Plan and the method of cure sought under Paragraph 6.3 of this Plan, and the Reorganized Debtors have failed to cure such default within one hundred and eighty  (180) days of receipt of the written notice.

12.6.   **Quarterly Fees**.  The Reorganized Debtors shall pay Quarterly Fees, based upon all post-confirmation disbursements made for post-Confirmation periods within the time periods set forth in 28 U.S.C. § 1930(a)(6) until the earlier of the closing of this Case by the issuance of final decree by the Court, or upon the entry of an order by this Court dismissing the case, or converting this case to another chapter under the Code.  The Reorganized Debtors shall provide to the U.S. Trustee upon the payment of each post-Confirmation payment a report indicating disbursement for the relevant periods.

12.7.  **Compliance.**  This Plan is not proposed principally for the purpose of avoidance of Taxes or the avoidance of the application of Section 5 of the Securities Act of 1933. The provisions of Code §§ 1145 and 1146 shall apply hereto to the fullest extent permitted by law.

12.8.  **Reservation under Code §1129(b).**  If all impaired classes do not vote in favor of the Plan, the Debtors shall seek confirmation of the Plan in accordance with Code § 1129(b) either under the terms provided herein or upon such terms as may exist if the Plan is modified in accordance with Code § 1127(a) and the Plan.

12.9.  **Reservation of Rights**.  If the Plan is not confirmed by Final Order, or if the Plan is confirmed and the Effective Date does not occur, the rights of all parties in interest in the Case are and will be reserved in full.  Any concessions, settlements or statements reflected therein are made for the purposes of the Plan only, and if Confirmation Date or the Effective Date does not occur, no party in interest in the Case shall be bound nor deemed prejudiced by any concession, settlement or statement.

12.10.  **Notices**.  All notices other than to the Debtors or Reorganized Debtors shall be deemed given when actually received or refused by the party to whom the same is directed.  Each party may designate a change of address or supplemental addressee(s) by notice to the other affected parties given at least five (5) Business Days before such change of address is to become effective or by filing a Plan Supplement prior to or after the Effective Date.

12.11.  **Recordation of Plan and Confirmation**.  A true, certified copy of the Plan and/or the Confirmation Order may be recorded in any public place appropriate for such recordation. Pursuant to Code § 1146(c), the making or delivery of an instrument of transfer under the Plan may not be taxed under any law imposing a stamp tax or similar tax.  In order to effectuate Code § 1146(c), each recorder of deeds or similar official for any county, city or governmental unit in which deeds for transfer of any property of the Estate is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such deeds for recording and promptly to record such deeds.  The Confirmation Order shall provide that the filing of any objection thereto shall not stay the effect of the Confirmation Order and shall not exempt or excuse any recorder of deeds or similar official from promptly accepting and recording any such deeds.

12.12.  **Headings**.  The article and section headings used in the Plan are inserted for convenience and reference only and neither constitutes a part of the Plan nor in any manner effect the terms, provisions or interpretation of the Plan.

12.13.  **Computation Of Time**.  In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

12.14.  **Severability**.  If, prior to the Effective Date, any term, provision or portion of any provision of the Plan is held by the Court to be invalid, illegal, void or unenforceable for any reason, the Court shall have the power to alter, amend and/or interpret such term, provision or portion of the provision to make it valid or enforceable to the maximum extent practicable,

consistent with the original purpose and intent of the term, provision or portion of the provision held to be invalid, illegal, void or unenforceable; and, except as may be determined by the Plan Proponent, and any other Person directly and materially affected, (i) such term, provision or portion of the provision will then be applicable and valid as so altered, amended, or interpreted or (ii) such term shall be deemed deleted from the Plan. The remaining terms, provisions or portions of the provisions of the Plan shall remain in full force and effect and will in no way be affected, impaired or invalidated by such alteration, amendment or interpretation.

12.15.  **Governing Law**.  Except to the extent that the Code is applicable, the rights and obligations arising under the Plan and any documents, instruments or agreements executed in connection with the Plan (except as otherwise indicated in such documents, instruments or agreements) shall be governed by, and construed and enforced in accordance with, the laws of the State of West Virginia, without giving effect to the principles of conflicts of law thereof.

12.16.  **Binding Effect**.  The provisions of this Plan and the Confirmation Order shall be binding upon and for the benefit of all parties in interest and all other Persons to the fullest extent permitted by Code § 1141.  The provisions of this Plan and the Confirmation Order shall also inure to the benefit of the Plan Proponent, and the Holders of Claims or Interests, and their respective successors, assigns, heirs and personal representatives, whether or not the Claims or Interests are impaired by the Plan and whether or not such Person or the Holder of any Claim or Interest voted to accept or reject the Plan or was deemed to have accepted or rejected the Plan.

[continued on next page]

12.17.  **Plan Controls**.  In the event that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, the provisions of the Plan shall control.

Respectfully Submitted,


By:/s/ Terrence L. Mason
      Terrence L. Mason, Individually
      Debtors-in-Possession



By:/s/ Tracey L. Mason
      Tracey L. Mason, Individually
      Debtors-in-Possession


MEDICAL REHABILITATIVE SERVICES, LTD.

By:/s/ Terrence L. Mason
Print: Terrence L. Mason
Title: President, Sole Shareholder
      Debtors-in-Possession

Dated: October 16, 2015